VERNON A. NELSON, JR., ESQ.
Nevada Bar No.: 6434
THE LAW OFFICE OF VERNON NELSON
9480 S. Eastern Avenue, Suite 252
Las Vegas, Nevada 89123
Tel.: 702-476-2500
Fax.: 702-476-2788
Email: vnelson@nelsonlawfirmlv.com
*Attorney for Plaintiffs Stephen LaForge and Bunny LaForge*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| STEPHEN LAFORGE and BUNNY LAFORGE,<br><br>Plaintiffs,<br><br>v.<br><br>RICHLAND HOLDINGS, INC. d/b/a ACCTCORP OF SOUTHERN NEVADA, a Nevada Corporation; R.C. WILLEY aka RC WILLEY FINANCIAL SERVICES, and RANDALL CORPORATION d/b/a Bowen Law Offices; CALEB J. LANGSDALE, ESQ. dba The LANGSDALE LAW FIRM, P.C.,<br><br>Defendant. | Case No: 2:17-cv-782<br><br><br>**RESPONSE OPPOSING MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs, by and through The Law Office of Vernon Nelson, files their RESPONSE OPPOSING DEFENDANTS MOTION FOR SUMMARY JUDGMENT. This Response is based on the following Points and Authorities, all pleadings on file, and any oral argument allowed by this Court.

**INTRODUCTION AND RELEVANT PROCEDURAL HISTORY.**

Plaintiffs' Opposition to Defendant's Motion to Strike First Amended Complaint. *Docket # 90* contains a statement of the Relevant Procedural History; which is incorporated by reference.

**III.  STATEMENT OF FACTS**

**A.  *Plaintiffs Contract With RC Willey and Subsequently Default; and RC Willey Assigns to Richland and Richland Engages Bowen to File the State Court Action***

Plaintiffs entered a contract with Defendant RC WILLEY for a line of credit to purchase home furnishings and related goods. ("The Contract"). *Docket #27-1.* The Contract was governed by Utah

THE LAW OFFICE OF VERNON NELSON
ATTORNEY AT LAW

Law. *Docket #27-5 at pp.17* ¶ 11. By May 2015, Plaintiffs were delinquent in their payments and had an account balance of $8,562.16 (the "Debt"). *Docket #27-5 at p.12 ¶ 5.* RC Willey assigned the Debt to Richland for collection. *Docket 27-5 at p.11.* Richland engaged Bowen to sue the Plaintiffs for the Debt, in the 8th Judicial District Court, in Case No.: A-15-726804-C, *Richland Holdings, Inc. d/b/a Richland of Southern Nevada v. Bunny LaForge and Stephen Laforge* (the "State Court Action").

### B. *The Application For Default Judgment in the State Court Action Contains Numerous Misrepresentations Made By Richland, RC Willey And Bowen*

#### 1. *<u>The Unlawful Collection Fee</u>* - Bowen represented Richland in the State Court Action *Id.* On December 29, 2015, Defendants filed an Application for Default Judgment. *Docket 64-4.* The Application included an Affidavit/Declaration signed by R.C. Willey's custodian of records, Pam Irvine (the "Irvine Declaration"). *Id. at pp.12-19.* The Application for Default Judgment alleged a "Contractual Collection Fee" of $4,281.08 was added to the principal of $8,562.16. *Docket # 64-4 at pp. 2, 5, 11, and 12.* This fee was unlawful because it equaled **50%** of the principal balance that RC WILLEY assigned to Richland (hereinafter the "Unlawful Collection Fee"). *Id. at p. 12.*

The Contract between Plaintiffs and RC Willey is governed by Utah Law. *Docket #27-5 at pp. 17* ¶ 11. Under Utah law, a collection fee cannot exceed 40% of the principal balance of the Debt. *Declaration of Vernon Nelson (DVN) attached as Exhibit 7 at ¶ 2-3.* Since the collection fee Collection Fee was equal to 50% of the principal balance of the Debt, it is 10% higher than the amount permitted by Utah law and the Contract (the "10% Overcharge"). *Id..* Based on their claim that the amount of the Debt was $8,562.16, and the amount of the Contractual Collection Fee was $4,281.08, all of the Defendants misrepresented, in the State Court Action, that the sum of $12,843.24 was due and owing from Plaintiffs (the "Overstated Amount Due"). *Id..*

The Application was filed on December 29, 2015 and states *the amount due and owing from the Plaintiffs was $12,843.24 as of November 10, 2015. Docket 64-4.* The Application also included the Affidavit of Marge Liggio, President of Richland which states Plaintiffs were indebted to Richland "for balance in the remaining principal amount of $12,843.24, together with the including Contractual

1  Collection Fees, plus interest accruing at the Contractual Rate of **24.00 %** from date of First

2  Delinquency and until paid in full, and cost of suit and reasonable attorney's fees." *Id. at p.4-5.*

3      The Application for Default Judgment also included the Declaration of Pam Irvine. *Id. at pp.*

4  *12-19.* Ms. Irvine declares she is the Custodian of Records of R.C. Willey Home Furnishings, Inc. *Id.*

5  *at p. 12 ¶ 1.* In paragraph five, Ms. Irvine claims Plaintiffs "became delinquent on May 6, 2015 with

6  an account balance of $8562.16…. *Id. at p. 12 ¶ 5.* She then admits the Unlawful Collection Fee was

7  added to the Debt when she states that a "contractual collection fee of $4,281.08 was added for a total

8  of $12,843.24." *Id.* She also states, "Interest will accrue at a CONTRACTUAL rate of 24%, which is

9  an amount equal to $219.57 through the date of signing of this affidavit." *Id.*

10      **2. <u>*The Unlawful Interest Charges*</u>-** All of the Defendants made multiple misrepresentations in

11  the State Court Action relating to the amount of pre-judgment interest owed on the Debt and the

12  amount of interest that would be owed after Richland obtained a Default Judgment against the

13  Plaintiffs (the "Unlawful Interest Charges"). *See Default Judgment attached Exhibit 1.* The

14  Application states the Default Judgment should include the Overstated Amount Due of $12,843.24,

15  plus prejudgment interest at the rate of 24% per annum…. *Id. at p. 2.* The Application is incorrect

16  because it seeks to recover 24% interest on the Overstated Amount Due. *Id.* The request is also

17  wrongful because it requests that "interest continue to accrue on the entire judgment amount at the

18  Contractual Rate from the date of First Delinquency until paid in full." *Id.* Bowen's request is

19  inconsistent with Ms. Irvine's Declaration.  *Id. at p. 12 ¶ 5.* In her Declaration, Ms. Irvine states

20  ***"Interest will accrue at a CONTRACTUAL rate of 24%, which is an amount equal to $219.57***

21  <u>***through the date of signing of this affidavit.***</u> *Id.*

22      Also, RC Willey's Mike Boswell testified he is responsible for the accounts receivable

23  portfolio and that … "Plaintiffs' account is part of [his] accounts receivable portfolio." *Deposition of*

24  *Mike Boswell ("DMB") attached as Exhibit 2 at p. 11.*  Boswell testified that on September 10, 2015,

25  RC Willey classified the account as "doubtful." *Id. at p. 52.* **Importantly, Mr. Boswell stated, <u>*"And***

26  <u>*at that point, no more late charges or interest was posted to this account.*</u> It remained in a delinquent

27  status. It was assigned to AcctCorp of Southern Nevada." *Id.* **Importantly, Mr. Boswell went on to**

28  **add that RC Willey <u>*didn't charge any more interest after September 10th.*</u>** *Id. at p. 53.*

Ms. Liggio's Affidavit also wrongfully states the Plaintiffs were indebted to Richland "for balance in the remaining principal amount of $12,843.24…*plus interest accruing at the Contractual Rate of 24.00 % from date of First Delinquency and until paid in full,* and cost of suit and reasonable attorney's fees." *Id. at p. 5 ¶ 5.* Ms. Liggio's Affidavit is wrongful for multiple reasons.

a. She seeks to recover 24% interest on the Overstated Amount Due. The request is wrongful because it seeks to recover 24% interest on the 10% Overcharge. *DVN at 2-3*

b. Her request is also wrong because, she asks that "interest continue to accrue on the entire judgment amount at the Contractual Rate from the date of First Delinquency until paid in full;"

c. Her statement about interest is inconsistent with the Declaration of Pam Irvine (*Docket #64-4 at p. 12 ¶ 5.* or the testimony of Mr. Boswell at *DMB at pp. 52-53.*

**C. Defendants Actions Enabled Richland to Obtain Default Judgment in the State Court Action For More Than  Plaintiffs Owed to RC Willey.**

As a result of the acts, omissions, and/or misrepresentations described in Sections II(B)(1) and(2) above, the Default Judgment provides for "[t]he sum of $12,843.24, together with and including Contractual Collection Fees, plus interest thereon from the date of the First Delinquency in the amount of $709.37, plus cost of suit in the amount of $604.50, plus reasonable attorney's fees in the amount of $750.00." *Id.* The Default Judgment also provides that "Interest shall continue to accrue at the Contractual Rate from the date of the First Delinquency forward until paid in full. *Id.*  The amount of the Default Judgment is more than the amount that Plaintiffs owed to RC Willey pursuant to the terms of the Contract (the "Inflated Judgment Amount") and the amount of interest awarded is more than RC Willey was permitted to collect. *Id..*

**D. *Richland's, Bowen's and Langsdale's Post-Judgment Collection Efforts in the State Court Action Were Unlawful Because They Made Misrepresentations, and Committed Unlawful Acts, That Allowed Them To Collect More Than Plaintiffs Owed to RC Willey.***

**1. *As Part of Post-Judgment Collection Efforts in the State Court Action, Defendants Unlawfully Misrepresented the Amount of the Debt and the Applicable Post-Judgment Interest Rate.*** Richland and Bowen engaged in post-judgment collection efforts in the State Court Action from May 2016 until August 2016. *DVN at ¶ 4-5.*  Langsdale then substituted in for Bowen. *Id.* Langsdale ceased representing Richland in January of 2017. *Id.* As described in Sections II (B) and (C) above,

Richland obtained a Default Judgment against the Plaintiffs with the assistance of Bowen and RC Willey's Pam Irvine for the Inflated Judgment Amount. *Id.*. If Defendants had not misrepresented the lawful amount of the Contractual Collection Fee, and if they had properly added a 40% collection fee, they should have demanded a collection fee of $3,404.86 and they should have demanded payment/judgment of $11,917.02 from the Plaintiffs. *Id.*. Because of the misrepresentations of the Defendants, Richland was awarded the 10% Overcharge (approximately $926.22 more than they would have been awarded if they had properly added the 40% Contractual Collection Fee). *Id.*.

Due to the misrepresentations of Defendants, Richland was awarded annual interest in the amount of 24% Interest on the 10% Overcharge. *Id.*. Per the Declaration of Pam Irvine (*Docket #64-4 at p. 12 ¶ 1)* and the deposition testimony of Mike Boswell (*DMB at pp. 52-53),* Richland, Bowen, and/or Langsdale should have demanded contractual interest of 24% from the date of delinquency through approximately September 10, 2015, or October 13, 2015. *Id.*. However, based on the misrepresentations of Defendants, Richland was awarded 24% interest from the date of delinquency until the Debt is paid in full. *Id.*. If Richland and Bowen had not misrepresented that Richland was entitled to 24% Interest until the Debt is paid in full, Richland would have been awarded statutory post-judgment interest of approximately 5.25% from approximately September 10, 2015 or October 13, 2015 (the "Excessive Post-Judgment Interest"). *DVN at ¶ 2-3*. The Excessive Post-Judgment Interest is included in the Unlawful Interest Charges defined Section II(B) above. *Id.*.

2. *Richland, Bowen, and Langsdale Continuously Tried to Collect the Inflated Judgment Amount and the Unlawful Interest Charges and They Have Unlawfully Issued Writs of Garnishment to Plaintiffs' Employers in the State Court Action.* Since the entry of the Default Judgment, Defendants have unlawfully attempted to collect the 10% Overcharge and the Unlawful Interest Charges; which is more than the Plaintiffs owe  Defendants. *DVN at ¶ 2-5.*

From May 2016 through approximately August 2016, Bowen and/or Richland participated in efforts to unlawfully garnish the Plaintiffs wages. *DVN at ¶ 7-8*. The wage garnishments were unlawful for several reasons. First, Defendants have not produced any evidence that the Clerk actually issued any Writs to Defendants *Id.*.  Plaintiffs obtained a copy of Writ that was purportedly issued on March 21, 2016 (the "March Writ"); which is less than a year before the Plaintiffs filed their

1  complaint in this case. *Id.*. The March Writ was directed to Home Depot in Atlanta, GA. *Id.*.

2  Defendants had to give an original and three copies of the Writ of Execution to court clerk to be filed.

3  *Id.*. The Court docket does not show the Writ was filed. *DVN at ¶7-8.* NRS 21.120 provides, in

4  pertinent part, "if personal property, including [wages] due or to become due, is not in the possession

5  or control of the debtor, the [constable], upon instructions from the creditor ...shall serve a writ of

6  garnishment in aid of execution upon the party in whose possession or control the property is found."

7  Defendants have not provided any proof that the March Writ was issued by the clerk or served by the

8  Constable and no return of execution has been filed with the Court. *Id.*.

9       The evidence in this case shows the Constable did not and could not have served the March

10  Writ on Home Depot in Atlanta, GA. *Id.*. Defendants employed the Henderson Constable to serve

11  Writs. *Id.*. However, the Constable, does not have authority/jurisdiction to serve a Writ of

12  Garnishment on Home Depot in Atlanta, GA. *Id.*. Defendants had to domesticate the judgment in

13  Georgia and obtain a writ of execution from a Georgia court. *Id.*. Also, the Notice of the Writ of

14  Garnishment must be served upon the judgment debtor in accordance with NRS 21.075 and 21.076;

15  relating to property levied upon by writ of execution. *Id.*. Plaintiffs never received such notice and

16  Defendants have not provided any evidence they sent it to the Plaintiffs. *Id.*.

17       Also, the Writ of Execution issued on March 21, 2016 unlawfully seeks to recover the Inflated

18  Judgment Amount; and it seeks to recover Unlawful Interest Charges (including interest on the 10%

19  Overcharge and unlawful post-judgment interest). *Id.*. Finally, the amount of accrued interest in the

20  Writ is not based on a rate the statutory post-judgment rate, nor is it based on the rate of 24%. *Id.*. The

21  Writ states the daily interest rate should be $8.44 per day. *Id.*. The Writ was issued approximately 30

22  days after the judgment. *Id.* Thus, the accrued interest should be about $250.00 and not $730.45. *Id.*

23       The DHR shows approximately eight garnishment payments were received by Richland based

24  on Writs of Garnishment obtained by Bowen. *Id.* The total of these payments is close to $4,200; which

25  is close to 50% of the original principal balance assigned by RC Willey to Richland ($8562.16). *Id.*

26  Richland received these unlawful garnishment payments after March 16, 2016. *Id.* Thus, the payments

27  were received within the year prior to date that Plaintiffs filed their Complaint. *Id.* Also, NRS 21.040

1  provides the Writ shall must be returnable to the clerk not less than 10, nor more than 60 days after its

2  receipt by the Sheriff. *Id.* The Docket does not show the execution was returned to the clerk. *Id.*

3      When Langsdale took over, he took unlawful efforts to garnish Plaintiffs wages until

4  December 2016. *DVN at ¶ 4-5.* Plaintiffs wages were garnished from October 2016 to December

5  2016. *Id.* Plaintiff obtained a copy of a Writ of Execution that Langsdale purportedly obtained from

6  the Clerk of the District Court in Clark County. *Id.* The Writ is dated November 21, 2016 (the

7  "November Writ"). *Id.* Defendants did not provide any evidence that the November Writ was filed

8  with the Court. *Id.* Defendants did not provide proof the November Writ was issued by the clerk or

9  served by Constable and no return of execution was filed with the Court. *Id.* Defendants employed the

10  Henderson Constable to serve Writs. *Id.* Yet, the Henderson Constable does not have jurisdiction to

11  serve a Writ of Garnishment on Home Depot in Atlanta, GA. *Id.* The Defendants had to domesticate

12  the judgment in Georgia and obtain a writ of execution from a Georgia court. *Id.*

13      On January 24, 2017, Bunny Laforge reported that she had just received in the mail a new

14  wage garnishment from Richland and she said monies will be deducted out of my paycheck soon. I*d.*

15  Plaintiffs' counsel told Ms. Laforge to send over all documents she received in the mail. Counsel also

16  promptly scheduled a "RUSH-PICK UP" with Nationwide Legal LLC and requested they pick-up any

17  copies of any documents that had been filed in the State Court Action. *Id.* Nationwide responded by

18  providing a copy of the Docket and stating that "nothing has been filed since 9-19-16." *Id.*

19      Concurrently, Ms. Laforge emailed Plaintiffs' counsel the following documents:

20      a. An misleading letter dated December 1, 2016 from **Richland to Home Depot regarding**
21      **compliance with garnishment documents**

22      b. A document that contains the first page of a Writ of Garnishment purportedly dated
23      December 8, 2016. The Writ appears to indicate that it was issued at the request of Mr.
       Langsdale. A copy of a check from ACCTCORP OF SOUTHERN NEVADA dated
24      November 17, 2016 payable to Home Depot in the amount of $5.00. The memo section of the
       check indicates that the payment is being made in connection with "LAFORGE A-15-726804-
25      C." The second page of the document is a set of ***INTEROGGATORIES TO BE ANSWERED***
       ***BY THE GARNISHEE AND SIGNED UNDER PENALTY OF PERJURY.***

26  *Id.* The November Writ unlawfully seeks to recover the Judgment Amount that includes the Unlawful

27  Collection Fee; and it seeks to recover Unlawful Interest Charges (including interest on the 10%

28

1    Overcharge and unlawful post-judgment interest). *Id.* Further, the amount of accrued interest was not

2    based on the lawful post-judgment rate; or even the unlawful 24% rate. *Id.*

3         Finally, Langsdale produced evidence showing he terminated his relationship with Richland in

4    early January 2017. *Id.* From early January of 2017 until March of 2017, Richland did not engage an

5    attorney to maintain meaningful involvement the garnishment of Ms. Laforge's wages. *Id.* Finally,

6    Attorney Donna Armenta substituted in for Langsdale in March of 2017. *Id.* Yet, the DHR shows

7    Plaintiffs wages were unlawfully garnished from January 2017 through March of 2017; when

8    Richland was not represented by counsel. *Id.*

9    **E.    Richland Engaged in the Unauthorized Practice of Law in the State Court Action.**

10        Langsdale's relationship with Richland terminated in early January 2017. *Id.* However, during

11   his relationship with Richland, he allowed Richland: (1) to use his e-filing codes and attorney

12   credentials to e-file documents with the Courts (the **"Unlawful Use of Credentials Violations"**); and

13   (2) he unlawfully allowed Richland to file documents on his behalf, under Richland's Account (the

14   **"Richland/Langsdale E-Filing Violations"**). *DVN at ¶ 9-11.* The Unlawful Use of Credentials

15   Violations and the Richland/Langsdale E-Filing Violations are prohibited by state and federal e-filing

16   rules.[1] Langsdale knowingly unlawfully allowed Richland to conduct financial transactions with the

17   Court on his behalf and Richland unlawfully filed documents, on Langsdale's behalf, under

18   Richland's separate and distinct e-filing account. Langsdale clearly knew Richland was unlawfully

19   using his credentials and that this practice was not allowed. *Id..* Yet, he knowingly allowed Richland

20   to engage in the Unlawful Use of Credentials Violations, and he knowingly allowed Richland to

21   commit the Richland/Langsdale E-Filing Violations. *Id.*

22        Upon his termination as Richland's counsel, Langsdale stated, in a January 3, 2017 letter:

23   _____

24   [1] The applicable rules and codes for electronic filing, require Langsdale (or certain persons employed by his firm) to
     file documents he signs by using his account and codes. *See* N.E.F.C.R. 13(b); *In re Authorization For Conversion To
     Case Management/Electronic Case Filing (CM/ECF),* Special Order 109, United States District Court, District Of
25   Nevada (September 27, 2005), ¶7 ("No authorized user shall knowingly allow the use of his or her User Log-In and
     Password by any other person unless that person is a member or an employee of the authorized user's law firm or
26   place of business."); *United States District Court, District Of Nevada, Electronic Filing Procedures* (Revised August
     24, 2006), § I.C. Non-Attorney Eligibility ("Non-attorneys shall not register as Filing Users unless, after motion,
27   authorized to do so by the court."), § II.B.3.i. Password Security, Prohibited Use ("No person may knowingly permit
     another person to use a Filing User's Password without authorization of the Filing User.")

28

*The Langsdale Law Firm directs your in-house legal department to immediately remove [Langsdale's] Nevada Bar number from any and all court systems used for accessing and/or electronically filing documents with all Nevada State and Federal Courts. This firm does not authorize you to utilize or facilitate any transaction via our attorney's legal credentials for any purpose, whatsoever.*

Also, at his deposition, Langsdale admitted he lacked meaningful involvement in Richland matters; including Richland's enforcement efforts against Plaintiffs. For example: (1) he did not review underlying judgments before he sought to enforce them; (2) he allowed Richland to use his Nevada Bar Number and e-filing log-in credentials. (3) he blindly relied on the accuracy of the underlying judgment, did not consider there to be any reason to verify the sums he was trying to enforce/collect, and he allowed Richland to prepare and file documents with his bar # and e-filing credentials. *Id.* By failing to undertake any meaningful involvement in the State Court Action, Langsdale facilitated Richland's Unauthorize Practice of Law. The DHR for Plaintiffs account contains numerous entries showing Richland: (1) unlawfully drafted and filed documents with the Court even though it had retained Langsdale to prosecute this case; (2) paid court filing fees by filing documents under its own account; instead of having Langsdale  file documents using his own e-filing codes, (3) unlawfully used attorneys' electronic signatures to file documents without providing the attorneys with an opportunity to review the documents; (4) unlawfully used electronic signatures of parties/non-attorneys on Declarations and other pleadings without providing attorneys with an opportunity to review the documents and confirm the truthfulness of Declarations. *Id._.*

The DHR for Plaintiffs' account shows Richland made an entry: *11/17/2016 11 :43:16 AM WILL RENEW GARN FOR CONS 1 AT POE I.* This means Richland noted it would renew the garnishment for one of the Plaintiffs at the "Place of Employment" identified by Richland. *Id._.* About 30 minutes later there is entry indicating that documents were sent to Langsdale to prepare writs; which is reflected as: *11/17/2016 12:15:32 PM AC5054: DOCS TO AHRNY TO PREP WRITS. Id._.* The next entry **which is made simultaneously at 12:15 PM,** states Langsdale signed the Writs in PDF; which is reflected as: *11/17/2016 12:15:32 PM ATTRNY SIGND WRITS IN PDF. Id.* It is impossible for Langsdale to have signed the Writs instantaneously and it is clear he did not sign the Writs.

Langsdale was no involved in the filing, service, or execution of the Writ. The Writ was filed by Richland on November 18, 2016. *Id.___ referencing  AcctCorp 001583-85.* The Writ is directed to

Home Depot in Georgia. *Id.* It states it was signed by the Clerk of Court on November 21, 2016. *Id.* Additionally, there is an entry on December 1, 2016, indicating Richland filed the Writs of Execution without the involvement of Langsdale; which is reflected as *12/01/2016 2:29:31 PM AC5055: FILED WOE IN PDF. Id._.* The DHR also indicates Richland worked with the process server "NOW," to send the Writ to the Henderson Constable to be served; which is stated as *12/01/2016 2:29:31 PM PREPPED NOW PACKET TO HENDERSON CONSTABLE TO BE SERVED. Id.* The are other entries on December 1, 2016 that show that Richland paid the Constable Fee and the Employer Fee without the involvement of Langsdale; which are stated as *12/01/2016 2:29:31 PM CONSTABLE SERVE FEE= S30.00; 12/01/2016 2:29:31 PM EMPLOYER FEE= $5.00 CHECK # 12/01/2016 2:29:45 PM CH#32039 12/01/2016 2:30:06 PM (156491-l)Misc. Fees Adjustment. Id* Finally, there is an entry stating a "Letter COVER I" was printed on December 1, 2016; which is stated as *12/01/2016 2:32:01 PM Letter COVER I printed for Account I 56491-1 10 DC.* This is the same date that is on the "Cover Letter" that **Richland** sent directly to Home Depot. *DVN at ¶ 12-13.* This letter was received by Ms. Laforge and Home Depot on January 17, 2017 (the "Richland Garnishment Cover Letter"). *Id.* This letter is the first and only communication that Mr. or Ms. Laforge received from Richland. *Id.* They never received any communication from Richland that satisfied FDCPA Section 1692g. *Id.*

Richland's Garnishment Cover Letter is misleading because it is on letterhead similar to letterhead used by many law firms. *Id.* It was also addressed like letters typically used by law firms and it expressly identified the caption and case number of the State Court Action. *Id.* The Richland Garnishment Cover Letter is also misleading because the content strongly implies that Richland is a law firm that represents creditors and it does not reference that Langsdale is the attorney of record. *Id.* The letter does not contain any statement that Richland is a collection agency. *Id.* The content of the letter also strongly and falsely implies Richland is authorized to work in partnership with the Sheriff or Constable. *Id.* To this point, the first paragraph of the Richland Garnishment Cover Letter states:

> ***Please be advised that this office represents the above named creditor. These garnishment documents which you have received notify you that there is a judgment against the above mentioned individual who has an account(s) or employment with your institution.***

*Id.* The letter is misleading because Richland appears to be providing legal advice, opining about legal issues/consequences, implying it has authority which it does not possess, and it presumes to inform Home Depot they have been lawfully served with the document and are obligated to respond. *Id.* The Richland Garnishment Cover Letter violates NRS 31.260 which provides that the writ must satisfy certain requirements. *Id.* The most relevant requirements applicable to this case are:

> a. ***the Writ must be issued by the Sheriff***; and

> b. …must require each person the court directs, as garnishees, to ***submit to the sheriff*** an answer to the interrogatories within 20 days after service of the writ upon the person.

*Id.* The letter violates NRS 31.260 because it falsely implies Richland may issue the writ and it unlawfully instructs Home Depot to submit the answers to interrogatories to Richland. *Id.* Home Depot responded the Garnishment Interrogatories on January 17, 2017. *Id.* Langsdale was not meaningfully involved in this matter; but bar number, and credentials were used to facilitate it. *Id.*

Bowen allowed Richland to commit similar E-Filing Violations in this case; and he facilitated Richland's Unauthorized Practice of Law in the State Court Action. Specifically, the DHR shows Richland: (1) unlawfully drafted and filed documents with the Court even though it had retained Bowen to prosecute this case; (2) paid court filing fees by filing documents under its own account; instead of having Bowen file documents using his own e-filing codes, (3) unlawfully used attorneys' electronic signatures to file documents without providing the attorneys with an opportunity to review the documents; (4) unlawfully used electronic signatures of parties/non-attorneys on Declarations and other pleadings without providing attorneys with an opportunity to review the documents and confirm the truthfulness of Declarations. *DVN at ¶ 14-15.* The DHR shows that on December 30, 2015 Richland filed the Application for Default Judgment and paid for the filing without any attorney review. *Id.* Similarly, the DHR shows the Order for the Default Judgment was filed at 12:34 pm without any attorney review on February 24, 2016 and Richland paid the filing fee of $3.50. *Id.* These entries show that Mr. Bowen did not sign the Application for Default Judgment, or the Order for

Default Judgment at 12:34 PM on February 24th. *Id.* The Declaration of Jamie Clark confirms Bowen did not sign these documents and Richland forged Mr. Bowen's signature. *Id.* Richland caused another Writ of Execution to be issued unlawfully on August 2, 2016. *Id.* Bowen did not sign this document. *Id.* This Writ is addressed to Home Depot in Atlanta. *Id.* The DHR shows the Writ was unlawfully prepared by, filed by, and paid for by Richland; not Bowen. *Id.* The evidence shows Richland unlawfully drafted and filed documents in the State Court Action that were purportedly drafted by Bowen, under Richland's filing account. *Id.* Richland's conduct in the State Court Action, constitutes the unauthorized practice of law. *Id.* Also, by allowing Richland to draft documents on his behalf, and by allowing Richland to e-file the documents under Richland's e-filing account, Bowen violated Nevada State Rules applicable to e-filing and he unlawfully allowed Richland to conduct financial transactions with Courts in his name. *Id.* By allowing Richland's conduct, Bowen violated his duty to be "meaningfully involved" with litigation for which he is responsible. *Id.* Bowen failed to undertake his duty to review the underlying contract and debt documentation to assure the accuracy of the judgment before filing. Bowen should have reviewed the documents and exercise his independent and professional judgment before filing any documents in the State Court action against the Plaintiffs.

**F. Richland Altered or Forged Documents In the State Court Action and Other Cases and It Knowingly Submitted False Documents in the State Court Action.**

The evidence shows Richland routinely and unlawfully altered Declarations and other documents filed with the Court; and it knowingly submitted false documents to the Court. Former Richland employees, David Kaplan and Jamie Clark testified Richland forged or altered Declarations and other documents to expedite the process of obtaining default judgments.[2]

**1. Kaplan's Testimony about the RC Willey Declarations in General**

Mr. Kaplan testified about the Application for Default Judgment which was part of Deposition Exhibit 1. *DDK at pp. 18-19.* He testified the "suit authorization had his name on it." *Id. at p. 20.* He testified about the contents of Deposition Exhibit 1. *Id. at pp. 27-31.* He testified he worked with Pam

---

[2] *Deposition of David Kaplan ("DDK") attached as Exhibit 3, Declaration of Jamie Clark at Docket 64-3, and Declaration of Jamie Clark ("DJC") attached as Exhibit 5 to DVN, Deposition of Pam Irvine ("DPI") attached as Exhibit 4. See also Deposition of Amanda Patterson ("DAP") attached as Exhibit 5.*

1    Irvine and Bryn Wicks of RC Willey regarding the documents included in Deposition Exhibit 1 and

2    that he would often speak to them. *Id. at pp. 31.* He testified about the Suit Authorization form in

3    Exhibit 1. *Id. at pp. 39-40.* He testified RC Willey assigned the principal amount of the Debt owed by

4    Plaintiffs to Richland in the amount of $8,562.16. *Id.*

5         Mr. Kaplan testified he developed a "template" for the RC Willey Declarations. *Id. at 41.* He

6    programmed Richland's "Debtmaster" system to print the template with all of the amounts in the

7    declaration automatically calculated and completed; and he created a "merge document" so the suit

8    authorization and declaration  would print out together and go to RC Willey as one package. *Id.* The

9    RC Willey Declaration is a two-page document. "Page 1" contains the calculation of the amount

10   owed; and "Page 2" is the signature page. *Id.* He emphasized Ms. Irvine checked the numbers and

11   dates on the Declaration *Id. at p. 43.* He said the collection fee provided for in Debtmaster went into

12   an Excel spreadsheet and Excel calculated the contractual collection fee was $4,281.08 based on the

13   principal balance of $8,562.16. *Id. at 44.* He testified Richland, was responsible for adding the

14   contractual collection fee and the principal balance and collection fee information is stated on Page 1

15   of the Declaration. *Id.* Mr. Kaplan testified that when Richland sent the declaration to RC Willey, it

16   did not include the documents referenced in the declaration. *Id. at 47.* He said RC Willey signs the

17   Declaration and they "attach all pertinent documents -- ledger, contract, whatever [Richland] may

18   need for the lawsuit. It all comes back to [Richland] in one full packet." *Id.*

19        ***2.    Kaplan's Testimony About Mistakes in Declarations***

20        ***Mr. Kaplan testified that if he noticed the Declaration contained a math error on Page 1 of***

21   ***the Declaration, Richland would "produce a new affidavit and [Richland replaced] it with the old***

22   ***page 1, such as right here." Id. at 48.*** He stated, " If those numbers are wrong with this and they've

23   already signed off on it, then we would just reproduce this document with the correct numbers." *Id.*

24   He also stated Richland would use the signature page (Page 2) that was attached to the original,

25   incorrect Declaration, and simply attach it to the new "corrected" Declaration. *Id.* Thus, the

26   Declaration could include "Revised Page 1" that was not reviewed by RC Willey; and a Page 2 that

27   RC Willey signed before Richland created the Revised Page (a "Revised Declaration"). *Id.* Obviously,

28   a Revised Declaration would be false and misleading. Given Mr. Kaplan's prior testimony about how

13

1   Ms. Irvine carefully reviewed the Declarations, it disturbing to learn that Richland would cavalierly

2   alter her Declaration without her input and without sending a complete and corrected Declaration back

3   to her  to sign in place of the incorrect Declaration.

4        *Mr. Kaplan also testified about occasions when name of the Declarant on the Page 1 did not*

5   *match the signature of the Declarant on Page 2 (e.g. Page 1 named Bryn Wicks as the Declarant;*

6   *but Pam Irvine had signed it).* Mr. Kaplan testified, "We try to catch that before it goes out. We

7   would make sure that the right signature page goes with the right account. You got Account A and

8   Account B. Bryn signed Account A. Pam signed Account B. Sometimes these pages get mixed up."

9   *Id. at p. 52.* Mr. Kaplan testified if Richland discovered this problem before it submitted the

10  Declaration to the Court, Richland would print a new page 1 that goes with the signature page" (a

11  "Renamed Declaration").  Kaplan said if page 14 of  Deposition Exhibit 1had been signed by Bryn

12  Wicks, and not Pam Irvine, then Richland would "go back and change page 13 to say Bryn at the top."

13  Mr. Kaplan's testimony about Richland's flippant handing of  Renamed Declarations is disturbing.

14  Richland should have sent Renamed Declarations back to the Declarant for proper execution.

15       *Mr. Kaplan also testified that "fixing documents" also involved "cutting" a signature from a*

16  *prior Declaration and "pasting" it to a new Declaration. Id. at p. 52-53.* Mr. Kaplan testified :

17
18
19
20
21
22
23
24

```
14  Q. (BY MR. NELSON) My question was as part of
15  fixing the documents -- right? -- was there ever a
16  time when you would cut and paste a signature from one
17  document and put it onto another document?
18  A. Yes, I have done that.
19  Q. Can you give me an example of when you would
20  have done that?
21  A. If somebody had sent over an affidavit that
22  was a package -- I'm trying to remember how this
23  works. So client signs off on it. However, they
24  don't sign in the right place on the signature page.
25  For instance, this one is outside the state of Nevada.
```

25
26
27
28

```
1  The other one is inside the state of Nevada. Say Bryn
2  sends it back -- or Pam sends it back saying that
3  she's inside the state of Nevada. Well, that's not
4  correct. So, yes, I would move a signature in that
5  instance to the right spot.
6  Q. Okay. How would you move the signature?
7  A. Using cut and paste.
```

8   Q. What system -- would that be on a PDF
9   document?
10  A. I would actually use IrfanView, which is a
11  JPG viewer. Convert the document to a BMP and use
12  Paint, Microsoft Paint, to actually move the signature
13  onto the PDF.
14  Q. Okay. Would you have -- so looking at
15  page 14, would you have to redact the signature that's
16  already on there and then put a signature from another
17  document on there?
18. Yeah.

*Id. at pp. 52-53.* Mr. Kaplan said he would "fix" documents in this way 3-4 times per month. *Id. at 55.* He said other people in Richland's office had been trained as to how to modify documents. *Id.* He stated "Aileen" would fix documents. *Id.* He stated other people knew how to fix documents and they were asked to fix them by Amanda Patterson or Marge Liggio. *Id. at pp. 55-59.* He testified he felt pressured by Amanda Patterson to fix the documents. *Id.* He said Paul Liggio was also aware documents were being "fixed." *Id. at p. 59.* He said Paul Liggio issued a directive telling staff not to "fix" documents; however, Amanda still gave him documents that needed to be fixed and she expected him to fix them. *Id.* This testimony about "fixing documents" by "cutting and pasting" signatures is troubling, and it puts Richland's credibility, and the credibility of its records at issue.

### 3. Jamie Clark's Declarations Show Richland Forged Documents Filed with the Court

Former Richland employee, Jamie Clark, has declared that Richland filed forged documents with the Court. In *Cox v. Richland et al., 2:16-cv-02914-APG-VCF,* she declared Mr. Langdale's, Ms. Patterson's, and a Notary's signatures were forged on documents filed with the court. *DVN at 16-17.*

Upon learning that Richland had forged the documents, Plaintiffs' counsel was concerned that this activity was not limited to one occasion. *DVN at ¶ 16-17 and referencing DJC.* Plaintiffs' counsel obtained a copy of a document signed by Mr. Bowen on June 15, 2016. *Id.* Plaintiffs' Counsel compared that signature with Bowen's signature on the Default Judgment Application in this case. *Id.* The signature on the Application for Default Judgment is different from the signature on the June 15th Document. *Id.* Counsel then compared the signature on the Order for Default Judgment. *Id.* The signature on the Order is different from the signature on the June 15th document. *Id..* Plaintiff counsel then showed documents and signatures to Jamie Clark. *Id..* Ms. Clark stated she knows the signatures

on the Application for Default Judgment and the Order for Default Judgment were not executed by Bowen. *Id.* Instead, they were improperly executed by Richland. *Id.* Plaintiffs' counsel also showed Ms. Clark the Writ of Execution dated March 21, 2016, with Bates number Richland 001562. Ms. Clark declared Mr. Bowen did not draft or sign this Writ of Execution. *Id.* Richland caused another Writ of Execution to be issued unlawfully on August 2, 2016. Again, Ms. Clark has declared the signature on this writ is not consistent with Bowen's signature on the June 15th Document. *Id.*

### 4. *Pam Irvine's Declaration Shows She Knowingly Made Statements Under Penalty of Perjury When She Did Not Know Whether the Contents of the Declaration Were True.*

Pam Irvine, the custodian of records for the State Court Action, testified she does not know whether the contractual collection fee applied by Richland is accurate and whether the total amount due stated in the Declarations are accurate. *DPI at p.59, 92-93, 94, 101-102,* She also testified she did not know whether the terms and conditions that she attached to the Declarations are the original of the contract because RC Willey's terms and conditions have changed over the years. *Id. at 71-81 and 96-98 .* Nevertheless, she declared, under the penalty of perjury, that the terms and conditions attached to her Declaration, and which provided that Utah law governed, were the terms and conditions that governed Plaintiffs Contract. *Id. at 93.* She admitted that she did not know whether the declaration was accurate. *Id. at 93-94.* Ms. Irvine admitted she signed declaration, under penalty of perjury, without knowing whether it was accurate. *Id.*

### 5. *Richland Knew the RC Willey Declarations Were Not Accurate When Filed.*

Mr. Kaplan testified Richland was aware the Contract with Plaintiffs was governed by Utah law. He stated "I'm aware of the problem, yes. This came up many years ago and RC Willey's response to it was to create a new disclosure for the Las Vegas accounts. This sheet here -- this is just the back of application. So it could have been one of the old ones. I don't know. All I know for sure is that that was worked out with our attorney at the time, and itwasn't a problem anymore. There was a defense to it. I don't know what that defense was. Bowen I think is the one that worked on that." *DDK at 67.* Additionally, Ms. Patterson testified, "The company is aware that at the time this agreement was entered into there was a different financial policy which had superseded the previous versions which states specifically that the state in which I reside governs the contract."

**G. RC Willey, Bowen, and Langsdale Knowingly Cooperated With, and Conspired with Richland's Unlawful Conduct Because RC Willey Bowen, and Langsdale All Made More Money When Richland Collected More Than They Were Lawfully Allowed to Collect from RC Willey Customers**

Defendants conspired and acted in concert to help Richland collect more than it was allowed to collect from Plaintiffs. RC Willey and Richland entered a written collection agreement that expressly authorized Richland to charge a 50% collection fee that violated Utah law (the "Collection Contract") *DVN at ¶18-20.* The date of the Collection Contract is September 19, 2011 and it states:

> **AGENCY** shall be entitled to add a fee of **50% (Recovery Rate 33.33%)** of all amounts collected where and when the accounts assigned for collections must be configured for "Legal Action", with the authorization of the **COMPANY,** "Forwarded" to another Agency or where the **AGENCY** must file "Probate Action" through its attorney.

The Contract between RC Willey and Plaintiffs provides the Contract is governed by Utah law. *DVN at ¶18-20.* Utah law limits collection fees to 40% *Id.* Thus, the Collection Contract is clear evidence that RC Willey and Richland unlawfully agreed to collect more than allowed by law. Also, the Collection Contract provides that Richland will only get 50% Collection Fee on matters that require litigation. *Id..* Richland only gets a 25% commission if a case does not require litigation. *Id..*

In his deposition in *Cutts v. Richland* [3] Mr. Liggio testified Richland had a Collection Contract with Dr. Clifford Molin (the "Molin Contract") that was similar to the RC Willey Collection Contract. *Deposition of Paul Liggio ("DPL") attached as Exhibit at pp. 70-71 and Ex. 10.* **Mr. Liggio said Richland makes more money when a collection fee is added to the debtor's account. Id. at p. 72.** He also testified about the 1692g letter that was allegedly sent to Mr. Cutts and the State Court Complaint that Richland filed against Mr. Cutts. *Id. at p. 82, and Exhibit 5 and Exhibit 7.* He stated the principal balance owed on Mr. Cutts's account was $274.00. *Id.* He stated that per the Molin

---

[3] Plaintiffs' counsel has filed several actions against Richland (collectively the Richland Matters). *DVN at 24-25.* All of the Richland Matters have involved allegations that Richland attempted to collect unlawful collection fees. *Id..* All of the actions have involved certain discovery disputes. *Id.* In this case Plaintiffs attempted to schedule the deposition of Mr. Liggio and other witnesses represented by Defendants' counsel. *Id..* The parties were not able to reach an agreement and Defendants filed a motion for protective order. *Id..* Magistrate Ferenbach granted the protective order as to three witnesses; but did not grant the motion for a protective order as to Paul Liggio. *Id..* The parties entered a stipulation that provided Mr. Liggio would not be deposed in this case because Defendants agreed that they would produce him for deposition in the Richland Case entitled, *Cutts v. Richland Holdings, et al. Case 2:17-cv-0152. Id..*

1  Contract, a 40% Collection Fee was added to the principal balance because Richland had not yet filed

2  suit. *Id.* Thus, the 1692g letter to Mr. Cutts stated the amount of the debt was $384.35; but it did not

3  explain that a 40% collection fee had been added. *Id. at Exhibit 10.* Liggio stated the amount of the

4  debt increased to $411.00 when Richland filed suit because the collection fee increased to 50%. *Id. at*

5  *82 and Exhibit 5.* Richland makes more money when the collection fee increases to 50% . *Id.*[4]

6        RC Willey makes more money when Richland collects the 50% collection fee. RC Willey's

7  Executive Vice President, Mike Boswell (p. 11) testified Richland remits all of the monies it collects

8  from RC Willey customers to RC Willey on a monthly basis and RC Willey pays a commission based

9  on the total amount recovered. *DMB at pp. 59-60.* If Richland collects more, RC Willey makes more.

10  Bowen and Langsdale both make more money when Richland files suit and it collects the 50%

11  contractual collection fee. Richland would have no need to hire Bowen or Langsdale if a Debtor were

12  to pay upon receipt of a 1692g letter from Richland. Finally, all of the Defendants have benefited from

13  Richland's unlawful acts and they have assisted Richland with its unlawful acts. RC Willey contracted

14  with Richland and allows it to charge the unlawful collection fee. RC Willey employees sign

15  Declarations, even if they do not know they are accurate so Richland can move forward with obtaining

16  default judgments. Bowen and Langsdale filed suit to collect the unlawful collection fees and the

17  unlawful interest charges, they helped Richland obtain judgments for the "Overstated Judgment

18  Amounts" and Unlawful Post-Judgment interest. Bowen and Langsdale violated their duty to maintain

19  meaningful involvement and they sat back and let Richland forge their signatures and unlawfully file

20  Court documents on their behalf.

21        Finally, Defendants inaccurately state certain facts are "undisputed." Plaintiff disagrees with

22  these facts are undisputed.[5]

23

24  _____

[4] In this case, Richland's purported 1692g letter stated the amount Plaintiffs owed was $11,416.21. *Id..* But the 25%

25  commission amount is overstated. If a 25% fee was added to the principal amount of $8,562.16, the amount would
only be $10,702.70. Richland's 1692g letter overstates the amount owed by $713.51. Richland sued Plaintiffs for

26  $12,843.24 and they clearly make more money by filing suit and collecting the 50% contractual collection fee.

27  [5] Defendants misrepresent RC Willey's involvement in the State Court Action by stating RC Willey's only
involvement was the provision of an Affidavit of Custodian of Records. RC Willey provided an unsworn statement

28  that attempted to comply with the requirements of NRS 53.045. RC Willey's statement was not an Affidavit as it was

III.   **LEGAL STANDARD**

A.   **MOTION FOR SUMMARY JUDGMENT.**

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to FRCP 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact and must support its assertion with admissible evidence. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* AFTER the moving party has properly supported the motion, the burden shifts to the nonmoving party to prove specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot defeat a motion for summary judgment "by

---

(cont.)
not notarized. *DVN at ¶ 21-23.* Also, Declaration was inaccurate, and the Declarant testified she signed the Declaration, under penalty of perjury, even though she did not know if the Declaration was accurate. *Id..*

Defendants misleadingly state the Application sought the principal amount owed, plus a contractual collection fee, and interest. Richland's own documents have conflicting amounts for the principal balance, the contractual fee violates Utah law; which governs the Contract, and the interest claimed in the judgment is inconsistent with RC Willey's testimonial evidence. *Id..*

Defendants falsely state the contractual collection fee and interest were lawfully added pursuant to Nevada law. Pam Irvine swore under the penalty of perjury that Utah law governed the Contract. *Id..* David Kaplan stated he worked with Ms. Irvine on the Declaration and he did not correct the Declaration to provide that Nevada law governed. Finally, Ms. Patterson acknowledged that the contact submitted to the State Court in support of the Default Judgment stated that Utah law governed. *Id..*Plaintiffs never agreed to any change to the governing law. *Id..*

Defendants falsely state they never communicated amongst themselves about any intention to charge unlawful collection fees or interest rates. To the contrary, the Collection Contract between Richland and RC Willey expressly states Richland can charge a 50% collection fee. *Id..* Moreover, all of the Defendants regularly communicated in an effort to obtain judgments that included the 50% collection fee and the unlawful amounts of interest. *Id..*

Defendants falsely state Ms. Irvine never had communications with Richland about charging unlawful collection fees or interest rates. To the contrary, Mr. Kaplan testified that he worked with Pam Irvine and that as part of those efforts he would talk to Ms. Irvine on the phone about the amounts contained in the Declarations. *Id..*

1  relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040,

2  1045 (9th Cir. 1989). If the record cannot lead a reasonable trier of fact to find for the nonmoving

3  party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

4  **IV.    LEGAL ARGUMENT**

5  ***A. There Are Genuine Issues of Material Fact Regarding Plaintiffs 1692g Claim.[6]***

6  ***1. Richland's Initial Communication with Ms. Laforge in January of 2017***

7        As stated in Section III(E) above, the January 2017 Letter was the initial written

8  communication Plaintiffs received from Richland. *DVN at ¶6-7.* Prior to the January 2017 letter, the

9  Plaintiffs had not communicated with the Defendants in any manner, outside of court pleadings. *DVN*

10 *at ¶6-7.* Although Ms. Laforge received the January 2017 Letter with her mail, the letter is addressed

11 to her employer Home Depot in Atlanta, Georgia.  *DVN at ¶ 6-7.* As is stated in Section III(E) the

12 letter is misleading and it does not meet the requirements of Section 1692g.

13        Section 1692g requires a debt collector to validate the debt to be collected by providing certain

14 information related to the debt either in the initial communication with the consumer or by providing a

15 written notice within five days after the initial communication. Per 1692g(a) the initial notice must

16 contain: (1) the amount of the debt;  (2)  the name of the creditor to whom the debt is owed;  (3)  a

17 statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity

18 of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (4) a

19 statement that if the consumer notifies the debt collector in writing within the thirty-day period that

20 the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a

21 copy of a judgment against the consumer and a copy of such verification or judgment will be mailed

22 to the consumer by the debt collector; and (5)  if necessary, a statement that, upon the consumer's

23 written request within the thirty-day period, the collector will provide the consumer with the name and

24 address of the original creditor.  The January 2017 letter did not satisfy these requirements. Thus,

25 Richland was required to provide a written notice within five days after the January 2017 Letter.

26 Richland failed to provide a written notice to containing the information required by Section 1692g(a).

27 _____

[6]Plaintiffs do not dispute they did not communicate with Bowen and they do not claim he violated 1692g.

28

### *2. Plaintiffs Deny Richland's Allegation It Sent Plaintiffs'1692g Letter in September 2015*

Plaintiffs learned Richland contended it sent them a written notice, in September 2015, that complied with §1692g. *DVN at ¶24-25.* Plaintiffs did not receive such notice. *Id.* [7]

### *3. The September 2015 Letter Does Not Satisfy the Requirements of Section 1692g.*

The RC Willey Collection Contract states Richland can collect commission of 25% on all amounts collected. *Id..* The contract also provides Richland can add a collection fee of 50% of all amounts collected on cases that are litigated. *Id..* The DHR for Plaintiffs' account shows RC Willey assigned the account to Richland on September 16, 2015. *Id..* It indicates the principal amount due on plaintiff's account was $970.69 and $4,640.33 in interest was due on plaintiff's account, or a total of $5,611.02. *Id..* Yet, a memorandum from RC Willey Home Furnishings, Store Code RC14. indicates the principal balance was $8,562.16. *Id..* The memorandum also includes an additional amount of $2,854.05; which appears be the 25% Commission payable to Richland. *Id..* The memorandum indicates the "balance" is $11,416.21. *Id..* [8]

Richland alleges it sent a validation of debt letter in September 2015 and the letter was its initial communication with Plaintiffs. *Id.* The letter stated the amount owed by Plaintiff's was $11,416.21, the original interest was $0.00, and the accrued interest was $0.00. *Id..* The letter did not specify the amount owed included a 25% commission of $2,854.05 *Id..* [9]

Section 1692g(a)(1) requires debt collectors to state the total amount due - interest and other charges as well as principal - on the date the letter was sent. *Heffington v. Gordon, Aylworth & Tami, P.C.*, 2017 U.S. Dist. LEXIS 212570 (D. Ore. 2017)(citing *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872, 875-76 (7th Cir. 2000). Additionally, a debt collection

---

[7] Paul Liggio testified Richland has multiple "1692g" letters. He testified Richland generally charges a lower contingency fee if they collect a debt without litigation. *DPL at pp. 70-72,* They charge a 50% contingency fee if they collect a debt after litigation has been initiated. *Id.* He testified Richland makes more money when they collect a collection fee; and if they file suit. *Id.* This fact affects Richland's credibility. *Id.* Based on Liggio's testimony, the Court can reasonably infer Richland would be motivated to claim it sent out a 1692g letter; even though it did not. *Id..* If a debtor does not receive a 1692g letter, it is less likely that the debtor will settle and/or dispute the debt. *Id..* If the debtor disputes the debts it can delay the legal collection process for 30 days and Richland would be motivated to avoid such a delay since it makes more money on debts collected after litigation has started. *Id..*

[8] This "balance" is incorrectly calculated because adding the 25% fee commission would make the balance 10,702.69.

[9] This commission amount was incorrect as 25% of the principal is only $2,140.53. DVN at ¶ 2-3.

1  letter "must state [the amount of the debt] clearly enough that the recipient is likely to understand it.

2  *Akram v. Cal. Bus. Bureau, Inc.*, 2016 U.S. Dist. LEXIS 170196 (S.D. Cal. 2016). This requires that

3  the debt collector disclose that interest is accruing on the debt, and state the amount of principal,

4  interest, and, fees when stating the amount due. *Santibanez v. Nat'l Credit Sys.*, 2017 U.S. Dist.

5  LEXIS 4519 (D. Ore. 2017) (citing *Miller; supra and Avila v. Riexinger & Assocs., LLC, 817 F.3d 72,*

6  *76-77)(2ⁿᵈ Cir. 2016)(*adopting "safe harbor language" stated in *Miller* and holding that safe harbor

7  language protects debt collector from liability under Section 1692(e)). Richland's September 2015

8  letter does not state the amount of the total amount due- interest and other charges as well as principal

9  on the date the letter was sent. *Id..* The letter does not identify the amount due included a purported

10  25% fee and the letter does not state that 24% interest continued to accrue on the principal amount and

11  the collection fee. *Id..* Thus, Richland's September 2015 letter did not meet the requirements of

12  Section 1692g.[10]

13  ***There Are Genuine Issues of Material Fact Regarding Plaintiffs Abuse of Process Claim.***[11]

14  Plaintiff has produced an abundance of evidence that shows there are genuine issues of

15  material fact regarding Plaintiffs Abuse of Process claim. To prevail on their Abuse of Process Claim,

16  the Plaintiffs must prove (1) Richland, Bowen, and Langsdale had an ulterior motive, other than

17  resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular

18  conduct of the proceeding. *LaMantia v. Redisi, 118 Nev. 27, 30 (2002)*. In *Credit Rating Bureau v.*

19  *Williams,* 503 P.2d 957, 960 (Nev. 1980); the Nevada Supreme Court affirmed a finding of abuse of

20  process where Plaintiff attached an entire property worth over $30,000 to secure a debt of less than

21  $5,000, with the ulterior purpose to coerce payment rather than to obtain security for the debt." In

---

22  [10] Plaintiffs; claim the September 2015 letter did not meet the requirements of Section 1692g is not untimely under

23  the FDCPA's one-year statute of limitations. In Ivy v. Nations Recovery Ctr., 2012 U.S. Dist. LEXIS 78450 (E.D.
     Tenn. 2012) the Court found the Debt Collector sent a letter to the Plaintiff on January 24, 2011. Id. The Debt

24  Collector argued the letter satisfied Section 1692g and, therefore, Plaintiff had to file her claim January 24, 2012. Id.
     The Court disagreed with the Debt Collector's argument and stated it was not clear the January 24, 2011 letter

25  satisfied 1692g; and if the letter did not satisfy 1692g, then Plaintiff's complaint was timely filed. Id. Richland's
     September 2015 letter did not meet the requirements of Section 1692g and it never sent another letter that complied

26  with Section 1692g. Thus, even if Richland did send the September 2015 letter, it did not meet the requirements of
     Section 1692g and Plaintiffs can maintain a claim under Section 1692g on that basis.

27  [11]Bowen contends it never had any communications with Plaintiff. Plaintiffs do not dispute this fact and they did not
     make any allegations against Bowen arising out of 1692g in their First Amended Complaint.

28

*Bull v. McCuskey*, 615 P.2d 957, 960 (Nev. 1980) the Nevada Supreme Court held coercing a nuisance settlement where there was no legal basis for a claim is also an abuse of process. In *Goldsmith v. Aargon Agency, Inc.*, 2018 U.S. Dist. LEXIS 55215 (D. Nev. March 30, 2018), Judge Navarro acknowledged an abuse of process claim requires that a plaintiff establish two elements: (1) the defendant had an ulterior purpose in the underlying lawsuit other than resolving a legal dispute; and (2) the defendant willfully and improperly used the legal process to accomplish that purpose. *Id.* Judge Navarro also noted that an ulterior purpose is any improper motive underlying the issuance of legal process. *Id.*  However, she pointed out the mere filing of a complaint is insufficient to establish the tort of abuse of process. *Id.* Judge Navarro rejected Defendants argument that Plaintiff Smith failed to state a claim for abuse of process. *Id.* Judge Navarro found Smith claimed Defendants initiated "legal proceedings against [him] for the ulterior purpose of collecting unlawful rates of interest and unlawful fees in violation of the FDCPA." *Id.*[12]

The evidence in this case shows the Defendants misused regularly issued process by demanding Plaintiffs pay a Collection Fee of 50%, even though their contract with RC Willey was governed by Utah law; which limits the collection fee to 40%. *Id..* By demanding the Plaintiffs pay a Collection Fee of 50%, Richland, Bowen, and Langsdale required Plaintiffs to pay more than they were obligated to pay to R.C. Willey. *DVN at ¶26.*

The Statement of Facts section of this Opposition sets forth evidence  showing Defendants engaged in multiple acts after filing that abused the process. Richland and Bowen subsequently filed the Application for Default Judgment that contained misrepresentations about the Unlawful Collection Fee and Unlawful Interest Charges *See Section II(B)above.* Richland and Bowen also undertook unlawful efforts to garnish the wages of Plaintiffs, after the filing the complaint and obtaining judgment, that constitute and abuse of process. *See Section II(D) above.* Richland and Bowen abused

---

[12] Judge Navarro noted Smith alleged Defendants subsequently sought to collect the unlawful rates of interest, and unlawful fees through the COJ, and Defendants did so willfully. *Id.*  Judge Navarro found Smith adequately alleged unlawful conduct emanating from both the filing of the COJ and the default judgment. *Id.* Smith alleged Defendants obtained five writs of execution that provided for sums not awarded to Defendants in the default judgment. *Id.*  Judge Navarro found Smith sufficiently pleaded a claim for abuse of process.

1    process by undertaking unlawful efforts, after the filing of the Complaint, that allowed Richland to

2    engage in the unauthorized practice of law as part of Defendants concerted efforts to collect more than

3    they were allowed to collect from Plaintiffs *See Section II(E) above.* Richland and Bowen also abused

4    process, after the filing of the Complaint by acting in concert to allow Richland to filed altered and

5    forged documents with Court as part of the Defendants concerted efforts to collect the more than they

6    were allowed to collect from Plaintiffs *See Section II(F) above.* All of these acts took place after the

7    filing of the Complaint and all of these acts were undertaken in furtherance of Defendants ulterior

8    motive of collecting more than they are allowed to collect from the Plaintiffs.

9        The facts of this case are akin to the claim of Mr. Smith in the *Goldsmith v. Aargon*

10   consolidated action. In this case, Plaintiffs have shown that Richland, Bowen, and Langsdale all

11   participated in efforts to unlawfully obtain writs of garnishment through forgery, that Richland

12   wrongfully acted like law firm, law enforcement authority, and/or a partner with a law enforcement

13   agency to be able to unlawfully enforce a writs of garnishment against Ms. Laforge's employer, Home

14   Depot, even though they are based in Georgia and are not subject to the authority of the Clark County

15   Sheriff or the Henderson Constable. The evidence in this case shows Defendants committed flagrant

16   and extraordinary acts that pervert the legal process. As state in Section II(G) above, Richland makes

17   more money when it files suit, so it is motivated to get a collection account into suit as soon as

18   possible. By filing suits without considering the merits just so the Debtor Collector can earn a higher

19   fee certainly amounts to flagrant and extraordinary acts that pervert the legal process.

20       Defendants claim that RC Willey cannot be liable for Abuse of Process because they did not

21   use the "legal system" is without merit. Several courts have determined that the filing of a false

22   affidavit with ulterior purpose can amount to an abuse of process. For example, in *Mobilio v. Dep't of*

23   *Law & Pub. Safety of N.J.*, 2008 U.S. Dist. LEXIS 51696 (D. NJ 2008) the Court denied Defendants'

24   motion to dismiss Plaintiff's abuse of process claim. The Court stated that Plaintiff alleged that the

25   criminal complaint filed against was obtained by means of a false affidavit that the Defendant knew to

26   be false. *Id.* The Plaintiff also alleged Defendants "acted with malice and his purpose was not to bring

27   the defendant to justice but to enhance his own career." *Id.*  The Court found that Plaintiff sufficiently

28   stated a claim for abuse of process. *See also, Verdon v. Song, 2018 Fla. App. LEXIS 9205 (Fla. Dist.*

1   *Ct. App. 5th Dist. June 29, 2018)(holding that Plaintiff sufficiently alleged abuse of process where*
2   *Wife filed false affidavit after she threatened criminal charges, demanded his credit card, and*
3   *threatened to do something he could not fix).* In this case, Plaintiffs produced evidence showing RC
4   Willey conspired with Richland and it allowed its employees to provide false affidavits to help
5   Richland obtain Default Judgments from which Richland and RC Willey profited. Also, Defendants
6   arguments relative to the *Whitt* case are irrelevant because the Court held Defendants had acquired the
7   Plaintiffs state law claim. Finally, Defendants claims as to Laforge's Abuse of Process Claim are
8   without merit because Plaintiffs have properly amended their complaint.

9   ***B. There Are Genuine Issues of Material Fact Regarding Plaintiffs NDTPA Claim.***

10   NRS 598.0915 provides it is a deceptive trade practice to knowingly make a false statement in a
11   transaction. RC Willey representatives and Richland representatives testified they handle a large
12   volume of cases and RC Willey Custodian of records regularly sign declarations under the penalty of
13   perjury that state: (1) the contractual collection fee applied by Richland is accurate; (2) that the total
14   amount owed by the debtor is accurate; and (3) that Custodian has examined the original of the
15   contract and made an exact copy of it and the reproduction of the contract attached hereto is true and
16   complete. *DVN at ¶27and 28.* RC Willey representatives/custodians of records, including Pam Irvine,
17   testified that they do not know whether the contractual collection applied by Richland is accurate and
18   whether the total amount due stated in the Declarations are accurate. *Id..* Also, RC Willey
19   representatives/custodians of records, including Pam Irvine, the custodian of records for the State
20   Court Action, testified that they do not know whether the terms and conditions that are attached to the
21   Declarations are the original of the contract because RC Willey's terms and conditions have changed
22   over the years. *Id..* In this case Ms. Irvine admitted that she did not know whether the declaration was
23   accurate. Ms. Irvine and other RC Willey employees have admitted that have signed declarations,
24   under penalty of perjury, without knowing whether the Declaration is accurate. *Id..* Accordingly, they
25   knowingly and/or recklessly sign Declarations under penalty of perjury even though they do not know
26   whether the content of the Declaration is accurate. *Id..*

27   Many courts have held that filing a false affidavit is an example of making a false statement in a
28   transaction. *See e.g. Elite Towing, Inc. v. Hernandez, 2001 Tex. App. LEXIS 1971 (Tex. .App. 2001).*

1   [13]Similarly, in this case, Plaintiffs purchased furniture from RC Willey. *Id.*. The Contract stated that it

2   was governed by Utah law which limits collection fees to 40%. *Id.*. RC Willey provided a false

3   affidavit that stated that RC Willey was allowed to add a 50% contractual collection fee. *Id.*. The

4   Contract was a transaction for the sale of goods; and RC Willey's false affidavit is false statement

5   made in that transaction. Thus, RC Willey violated NRS 598.0915.

6       NRS 598.092, and NRS 598.0923 provide it is deceptive trade practice to knowingly

7   misrepresent the legal rights, obligations, or remedies of the party to a transaction. *Id.*. The Contract

8   between Plaintiffs an RC Willey states the Contract is governed by Utah law. *Id.* Utah law limits

9   collection fees to 40% of the principal amount. *Id.* Yet, RC Willey representatives have testified they

10  know Richland charges a 50% collection fee and RC Willey allowed Richland to charge the Plaintiffs

11  a 50% Collection Fee. *Id.* Thus, RC Willey has misrepresented to the Plaintiffs their legal rights,

12  obligations, or remedies pursuant to the contractual transaction they conducted with RC Willey. *Id.*

13  Other Courts have held similar conduct violate similar DCTPA statutes. [14]

14

15  [13] In *Elite Towing,* Elite Towing had towed a truck and claimed a storage lien on the truck. *Id.* Elite sold the truck to
    used car dealership name Elite Wholesales. *Id.* Elite Wholesale could not locate any documentation evidencing that it

16  purchased the truck from Elite Towing. *Id.* The owner of Elite Wholesale also owned Lynn's Paint and Body Shop. *Id.*
    He had Lynn's Paint and Body Shop perform repair work on the truck that amounted to $4,950.00; but no one was

17  invoiced or charged for the work. *Id.* Lynn's filed a mechanics lien on the truck. *Id.* As part of the mechanic's lien,
    Lynn's was required to file a "Questionnaire Affidavit." The owner of Lynn's had a Lynn's employee sign the

18  Questionnaire Affidavit. The affidavit stated that the owner of the truck, Donald Norman. *Id.* The affidavit stated that
    Norman had called requested towing and repair and that Lynn's called Norman about the cost of the repair; however,

19  Norman left the truck and never returned. *Id.* The affidavit was false. Lynn's sold the car to Budget Wholesalers, a
    company owned by the son of the owner of Lynn's. *Id.* Budget sold the truck to Hernandez. *Id.* After Hernandez

20  purchased the truck, police officers confiscated it and another court determined Valley National Bank was entitled to
    the truck. *Id.* Hernandez sued Elite Towing, Elite Wholesales, Lynn's Paint and Body Shop, Budget Wholesalers, and

21  their principals for violating the Deceptive Trade Practices-Consumer Protection Act (DTPA). *Id.* After a bench trial,
    the trial court entered judgment allowing Hernandez recover $ 53,118 plus $ 22,362.26 in attorneys' fees from the

22  Ruffin defendants, jointly and severally. Elite Towing and its principal appealed, and the appellate court affirmed the
    trial court's judgment and found that the DTPA applied because truck was a good and Elite Towing was jointly and

23  severally liable for the false statement of Lynn's that was made in connection with the sale of the truck.

24  [14] In *Leal v. Furniture Barn, Inc.*, 571 S.W.2d 864, 865-866  (Tex. 1978), the Plaintiffs purchased furniture
    from the Defendants on "lay-away" and signed an installment contract with Defendant. *Id.*  Plaintiffs subsequently

25  decided they did not want the furniture and they sought a refund of their down payment. *Id.*  Defendant sent Plaintiffs a
    letter stating they needed to pay $40.00 by October 11th and if they failed to do so all deposit monies would be

26  forfeited. *Id.*  Plaintiffs sued based on violations of Texas's Deceptive Trade Practice Act which made it unlawful for a
    party to represent an agreement confers or involves rights, remedies, or obligations which it does not have or involve,

27  or which are prohibited by law. *Id.*  The trial court determined that Defendant's letter misrepresented the terms of the
    installment contract held Defendants violated the DPTA and the Court of Appeals reversed. *Id.* The Texas Supreme

28  Court reversed the Court of Appeals and affirmed the trial court's ruling that Defendant violated the DPTA.

Like the Defendant furniture store in *Leal,* RC Willey has mispresented the terms of the Contract. Thus, RC Willey has violated NRS 598.092, and NRS 598.0923.[15]

### C. There Are Genuine Issues of Material Fact Regarding Plaintiffs Conspiracy Claim.

Defendants unlawfully engaged in a Civil Conspiracy to cause damage to the Plaintiffs. *See Section III(G) of SOF.* The concerted actions of the Defendants accomplished their objective of making money at the expense of Plaintiffs and Plaintiffs suffered significant economic and emotional damages because of the concerted actions of the Defendants. *DVN at ¶ 29-30.*

The concerted actions of the Defendants are evidenced by the fact that RC Willey and Richland entered the Collection Agreement and they knew, or reasonably should have known that the Collection Agreement violated Utah law and allowed Richland to charge a 50% Collection Fee. In addition, the evidence set forth in Section III(G) of this memorandum supports a reasonable inference that there had to be an agreement/concerted effort whereby: (1) RC Willey agreed to write-off and assign cases over to Richland quickly; (2) Bowen and Langsdale had to agree to work quickly and/or agree that Richland employees could draft, file, and forge pleadings on their behalf; (3) Richland could file pleadings under its e-filing account, instead of Bowen's and Langsdale's e-filing accounts; (4) RC Willey agreed to employ "robo-signers" to sign Declarations under the penalty of perjury even though the "robo-signers" did not know the Declarations were true; (5) RC Willey agreed it would correct, alter, and/or forge inaccurate Declarations signed RC Willey employees; (6) RC Willey and Richland agreed to dual reporting of inaccurate information about Plaintiffs account to the credit bureaus; and (7) RC Willey would receive all funds, remit a 25% commission to Richland; which often meant RC Willey collected more than they were entitled to collect under the Contract with the

---

[15] It is important to note in *Kelley v. Fairway Chevrolet Co.*, 2015 Nev. Dist. LEXIS 1538 the Court held:

*a knowing violation under the NDTPA does not require knowledge on behalf of the Defendant that the act or omission engaged in was in violation of NRS 598.0923(3), NAC 482.180(3) or NAC 482.120(1). Only the affirmative and/or volitional choice or decision to do the underlying act is all that is required to find a "knowing" violation. This only applies to provisions of the NDTPA that specifically set forth a "knowingly" standard to constitute a violation, such as NRS 598.0923(3), as opposed to some other provisions of the NDTPA, which by their very language, require some sort of specific intent element to find a violation.*

In this case, there is no doubt that RC Willey, through Ms. Irvine, knowingly signed the Declaration included in the Application for Default Judgment. She did not have to know that her actions violated NRS 598.0923(3).

1   Laforges and other RC Willey customers.  *Id.*. This concerted effort allowed RC Willey, Richland,

2   Bowen, and Langsdale to churn cases quickly; which allowed the Defendants to collect more

3   contractual collection fees and more unlawful amounts of interest. *Id.*.

4        The facts stated in III(G), and elsewhere in this Memorandum clearly show the knowledge on

5   the part of the Defendants of the unlawful objectives of the Defendants; and each Defendant's intent

6   to aid in achieving that objective. *Id.*. Certain facts set forth above expressly show each Defendant had

7   knowledge of the object and purpose of the conspiracy, that there was an agreement to injure the

8   Plaintiffs and other customers of RC Willey. *Id.*. Other facts set forth above show, by reasonable

9   inference, the knowledge on the part of the Defendants of the unlawful objectives of the Defendants

10  and each Defendants intent to aid in achieving that objective. *Id.*. The facts set forth in Section III also

11  show each Defendant had knowledge of the object and purpose of the conspiracy. *Id.*. Each Defendant

12  knew its role in the conspiracy and it knew the role of the each of the other Defendants in the

13  conspiracy. *Id.*. Each Defendant knew it had agreed to participate in a concerted effort to injure the

14  Plaintiffs and other customers of RC Willey. The evidence set forth above, and other evidence

15  produced during discovery, shows there was a meeting of the minds amongst the Defendants as to the

16  objective and course of action. *Id.* .As a result, the Defendants committed multiple unlawful acts that

17  resulted in injury to the Plaintiffs. *Id.*.

18       The Nevada Supreme Court held "an actionable civil conspiracy is a combination of two or

19  more persons who, by some concerted action, intend to accomplish some unlawful objective for the

20  purpose of harming another which result in damage." *Full Spectrum Laser v. Co. V., 2013 Nev. Dist.*

21  *LEXIS 407 (2013)(citing In Collins v. Union Federal Sav. & Loan Ass'n, 99 Nev. 284, 303 (1983).* [16]

22

23  [16] In *Full Spectrum,* the 8th Judicial District Court granted Plaintiffs Application for Default Judgment on its claim for
    civil conspiracy after an evidentiary hearing. The Court found Plaintiff hired Defendant Kaspar as its CFO. *Id.* He was
    instructed to create a website for Full Spectrum and he contracted with Jenesis Design to create the website. *Id.*
24  Kaspar did not disclose he was married to the owner of Jenesis Design (Traci Kaspar) or that he was the technical
    contact for Jenesis Design's website. *Id.* The Court found Kaspar "financially benefitted from the engagement" and he
25  "would likely continue to have access to the website and certain proprietary information belonging to FSL...." Kaspar
    set up a competing company and he misappropriated trade secrets and proprietary and confidential information. The
26  Court held Mr. and Mrs. Kaspar "conspired with one another to financially benefit from an undisclosed interested
    transaction entered into by Mr. Kaspar on behalf of Full Spectrum and Ms. Kaspar on behalf of Jenesis Design and to
27  obtain access to the CRM database, containing trade secret, proprietary and confidential information belonging to
    FSL, for purposes of diverting said confidential information to Defendants competing company."

28

Like the Defendants in *Full Spectrum,* Richland and RC Willey acted in concert with the intent of collecting the unlawful collection fee. Richland and RC Willey intentionally entered a contract that allowed Richland to charge a 50% collection fee to the Defendants. *See Section III(G) above.* The contract between RC Willey and Richland violated Nevada law. *Id.* They worked in concert to accomplish the unlawful objective of collecting the unlawful 50% fee by preparing false Declarations for RC Willey employees to sign as part of Richland's Application for Default Judgment against the Defendants. *Id.* Both RC Willey and Richland knew that the RC Willey employees did not know if their Declaration were true, but RC Willey intentionally supplied them Richland and Richland intentionally filed the Declarations with the Court and/or engaged Bowen and Langsdale to file the false Declarations. Langsdale and Bowen acted in concert with Richland and RC Willey as they were retained by Richland to obtain default judgments that provided for the unlawful collection fee and the unlawful interest charges. *Id.* The purpose of the Defendants' actions was to collect more monies than they were lawfully allowed to collect from Plaintiffs; resulting in damage to Plaintiffs. *Id.*.

Finally, it is important to note that in *Roman v. Chase*, 2010 U.S. Dist. LEXIS 147809 (D. Nev. 2010), the Court found that Plaintiff had sufficiently plead a cause of action for fraud against two defendants. With respect to Plaintiff's claim for unlawful conspiracy the Court noted it had found that Plaintiff had sufficiently alleged fraud; and the Court noted that in his complaint, plaintiff alleged that the defendants acted together and had an "agreement to defraud" him, which led to damages to his business." *Id.* Thus, the Court held Plaintiff "alleged all the necessary elements of a claim for civil conspiracy to commit fraud." *Id.* Similarly, in this case, the Plaintiffs have alleged that Defendants committed an abuse of process. In this regard, Plaintiffs have produced an abundance of evidence that shows: (1) Richland, Bowen, and Langsdale had an ulterior motive, other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. The same evidence that supports Plaintiffs abuse of process claim is also evidence that by way of their concerted efforts, the Defendants intended intend to accomplish some unlawful objective for the purpose of harming the Plaintiffs.

**D. *Defendants Arguments About Claim Preclusion and Rooker-Feldman Were Previously Rejected By The Court***

The Court previously rejected the Defendants arguments based on Claim Preclusion and *Rooker-Feldman*. *Docket #57.* The Defendants arguments have not changed, and the Court should reject these arguments. To the extent it is necessary for Plaintiffs to respond to these arguments, Plaintiffs incorporate the arguments set forth in *Docket # 27.*

   **E. Defendants Have Not Raised Standing Argument and Cannot Raise It For the First Time on Summary Judgment.**

   Defendants have vigorously defended this claim from the beginning of the case. Prior to this motion for summary judgment they did not raise the argument that Plaintiffs lack standing. *DVN at ¶ 31.* They allege they acquired Plaintiffs causes of action in November of 2017. However, they have defended this action, including the state court claims, since November of 2017 and never challenged Plaintiffs standing. *Id.* They cannot do so for the first time on summary judgment. *See Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (stating that parties generally cannot assert facts and legal theories raised for the first time at the summary judgment stage).

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff submit there are numerous genuine issues of material fact and Defendants are not entitled to judgment as a matter of law. Accordingly, their motion for summary judgment must be denied.

DATED this 20th day of July 2018

THE LAW OFFICE OF VERNON NELSON

By:    _____*/s/Vernon Nelson*_____
VERNON NELSON, ESQ.
Nevada Bar No.: 6434
9480 S. Eastern Avenue, Suite 244
Las Vegas, NV   89123
Tel:  702-476-2500
Fax:  702-476-2788
E-Mail:  vnelson@nelsonlawfirmlv.com
*Attorney for Plaintiff Stephen LaForge and Bunny LaForge*